## BROWN vs. RUNALS.

A court of equity may compel a specific delivery to the pledgor, of a note or mortgage held by the pledgee, after the payment of the debt to secure which such note or mortgage was pledged, on the ground that the retention of them by the pledgee was in violation of a trust.

June Term,
1861.

BROWN
v.
RUNALS

The action to compel such delivery, and in the meantime to restrain the negotiation of the securities, is such an action as was formerly denominated equitable.

Under the constitution of this state (Sec. 19, Art. VII), a party to an action such as was formerly denominated equitable, is entitled to have the testimony in the case taken in open court, subject to the same exceptions as are allowed by law in actions such as were formerly denominated legal.

APPEAL from the Circuit Court for *Dane* County.

The complaint in this action (which was commenced on the 2d of June, 1859), alleged in substance that on the 25th of August, 1858, the plaintiff made his promissory note for $200, payable with interest October 25th, 1858; that afterwards, as collateral security for the payment of said note, then held by the defendant, he deposited with said defendant five notes for $200 each, made by one Spaids, and a mortgage executed by Spaids to secure six notes, including the five so deposited; that subsequently the plaintiff borrowed of the defendant $50, and deposited with him as collateral security therefor, the remaining note so secured by said mortgage, which was also for $200; that on the 24th of May, 1859, the plaintiff was notified that the defendant would, on the 30th of that month, sell said notes at public auction; that previous to the hour fixed for such sale, the plaintiff tendered to the defendant the principal sums due him as aforesaid, together with the interest then due thereon, and demanded said collateral securities, but the defendant, after taking the money, refused to deliver them, but postponed the sale to the 2d of June, 1859 and threatened to sell them on that day. Prayer, that the defendant be enjoined from selling said notes and mortgage, and be required to deliver up to the plaintiff the note so made by him, and also said collateral securities, &c.

The answer alleged in substance, that the securities mentioned in the complaint were deposited with the plaintiff by the defendant to secure the payment of a sum exceeding $2,900, and that less than $1,900 of said sum had been paid. When the case was called for trial, the circuit court decided that it should be tried without a jury, for the reason that it was a chancery case, and made an order, of its own motion, directing the testimony to be taken by a referee, to

which the defendant excepted. The testimony so taken tended to show, among other things, that on the 22d of November, 1858, the defendant advanced to the plaintiff $65, for which, by the agreement of the parties, the notes and mortgage of Spaids, mentioned in the complaint, were to be held as security, as well as for the $250 therein mentioned; and that the whole amount so secured, including said $65 with interest thereon, had been paid to the defendant before the commencement of this action. On the coming in of the referee's report, the court found the facts substantially as alleged in the complaint, and rendered judgment in accordance with the prayer thereof.

*J. J. Pettit*, for appellant.

*Coon & Cotton*, for respondent.

*By the Court*, COLE, J. This action was brought for the purpose of enjoining the appellant from selling certain collateral securities, consisting of several promissory notes and a mortgage on real estate, which had been deposited with him by the respondent to secure the payment of two other promissory notes mentioned in the complaint. The respondent claimed that the latter notes were paid ; and asked that the collateral securities should be given up to him. It appears that the appellant was about to proceed to sell at auction the collaterals, when the respondent made a tender and payment of the amount for which he insisted they had been pledged.

When the object of the action and nature of the relief asked in the complaint, are considered, there can be no doubt that the proceeding is one in equity. The circuit court held it to be an equity case ; and the counsel on both sides fully agree that this is a correct view of the cause.

At first we had some doubt as to whether the remedial powers of a court in equity could be invoked to compel a specific delivery of these securities, even though the respondent showed that he had a clear right to their possession.— "Ordinarily," says Justice Story, "in case of chattels, courts of equity will not interfere to decree a specific delivery, because by a suit at law a full compensation may be obtained

*June Term,*
*1861.*

BROWN
v.
RUNALS.

December 30.

in damages, although the thing itself cannot be specifically obtained; and where such a remedy at law is perfectly adequate and effectual to redress the injury, there is no reason why courts of equity should afford any aid to the party." 2 Eq. Jur., § 708. In the next section, however, he adds, that "there are cases of personal goods and chattels, in which the remedy at law by damages would be utterly inadequate, and leave the injured party in a state of irremediable loss. In all such cases courts of equity will interfere and grant full relief by requiring a specific delivery of the thing which is wrongfully withheld." A number of cases are cited in the note in illustration of this doctrine, which show that this jurisdiction has generally been exercised to compel the delivery of a thing of some peculiar value, as a family relic, or ornament, or heir-loom, the loss of which could not be fully compensated in damages, when withheld from the owner. See also cases cited in Willard's Eq. Jur., 358, et seq. But we are of the opinion that this action is maintainable on another ground. Where a party obtains possession of chattels through some trust or fiduciary relation to the owner, and then attempts to hold the possession wrongfully, a court of equity may entertain a suit for the specific delivery of the thing withheld. The subject of trusts is a matter peculiarly of equitable cognizance, and we suppose a pledge of personal property creates a trust in respect to such property. The pledgee has a right to retain and hold the property pledged until his debt is paid, and then he is bound to restore it to the pledgor. Thus a fiduciary relation is created between the parties in respect to the pledge, from which arise various obligations and duties. In *Wood vs. Rowcliffe*, 2 Phillips (22 Eng. Ch. R.), 381, the Lord Chancellor said: " Where a fiduciary relation subsists between the parties, whether it be the case of an agent or a trustee, or a broker, or whether the subject matter be stock, or cargoes, or chattels of whatever description, the court will interfere to prevent a sale, either by the party entrusted with the goods, or by persons claiming under him through an alleged abuse of power." Same case in 3 Hare (25 Eng. Ch. R.), 303; *Cowles vs. Whitman*, 10 Conn., 121. Within the

doctrine of these cases it may well be held, that a court of equity would not remit the respondent to his remedy at law for a conversion of the collaterals, but would order the appellant to deliver them up if he has no longer the right to retain possession of them. And that the debt for which the particular securities in controversy were pledged, had been discharged, there does not seem to be much room for doubt. For to our minds the proof is clear and satisfactory that the appellant could only hold the Spaids notes and mortgage as security for the payment of the $200 note given the Kenosha County Bank by the respondent, and the interest thereon—the $50 note given the appellant, and interest—and the $65 advanced in November, 1858. And when the amount of these several items of indebtedness was tendered to the appellant, his right longer to hold the above named collateral securities ceased and determined. It is claimed and insisted that the appellant had a right to hold on to these collateral securities until the respondent's entire indebtedness to him was discharged. But we do not think the evidence in the case sustains the position. On the contrary it shows that the specific indebtedness for the payment of which the Spaids notes and mortgage were pledged, was at most the amount of the three items above stated and none other. So that we should have no difficulty whatever in affirming the judgment of the circuit court upon the merits as disclosed by the testimony, were it not for an objection which we will proceed to notice.

As before stated, this is undoubtedly a suit in equity. When the cause was called for trial, the circuit court proceeded to hear the testimony and reduce it to writing; but it appearing that the evidence would be voluminous and consume too much time, to the detriment of other business, the court ordered that all the evidence be taken before a referee or special commissioner, and be reported to the court. To this order the appellant objected at the time it was made. He afterwards objected to the admission on the trial of the evidence which was taken before the commissioner, on the ground that it had been taken without authority, and that under the constitution he had a right to have the witnesses

produced and sworn in open court. And the question which we have to consider is, Does not the constitution secure to a party in a chancery suit the right to have the witnesses examined in open court, subject to those exceptions provided for in cases at law? If it does, we cannot see but that the judgment in this case must be reversed, because the appellant was deprived of this right claimed by him on the hearing of the cause. The provision of the constitution upon which he relies in support of this position, is section nineteen, Article seven, which reads as follows: "The testimony in causes in equity shall be taken in like manner as in cases at law; and the office of master in chancery is hereby prohibited."

It is not difficult to arrive at the meaning and intent of this provision of the constitution. The idea conveyed is clear, and can hardly be conveyed in fewer words than are here employed. "*The testimony in causes in equity shall be taken in like manner as in cases at law.*" How is testimony taken in actions at law? With few exceptions, it is taken by the examination of witnesses on the trial before the court and jury. This is the almost universal practice of taking testimony in common law cases. And the advantages of this method of investigating facts, where the witnesses are orally examined, and where their appearance, manner and conduct in giving their testimony can be seen by the court and jury, are too obvious to need comment. This method of trying causes and taking testimony is extolled by all writers as constituting one of the most valuable and excellent features of our common law practice. And it is unquestionably the safest and most satisfactory method of investigating facts, and affords the greatest protection to the rights and liberties of the citizen. It was the benefit of this system of taking testimony which the framers of the constitution intended to secure to the parties in equity cases. It was therefore declared in that instrument, that the testimony in equity cases should be taken in like manner as at law. The object was to have the witnesses examined before the judge who is to decide the cause. It is well known that under the old chancery system the practice was to take all the testimony out of court, before an examiner, master, or some other officer appointed

for that purpose. The case was then tried by the chancellor altogether on written proofs. But the abuses of this system became great and crying. The examination of witnesses was oftentimes needlessly protracted, and the expense became enormous, the fees for taking testimony frequently amounting to thousands of dollars. It was evidently this evil that the constitutional provision was intended to guard against in giving parties in equity cases the right to have the witnesses orally examined in court. It was undoubtedly supposed that when the office of master in chancery, or examiner, &c., was abolished, and testimony taken before the court which tried the cause, a great mass of the irrelevant matter which generally finds its way, and certainly has in this case found its way, into the written depositions, would be rejected. It is suggested that it would be inconvenient, if not impracticable, for the court to sit and take the testimony in equity cases. But perhaps the time required to take the evidence before the court in a chancery case, will be to a great extent compensated by the time saved in not having to review and examine a mass of written testimony of an irrelevant character. However this may be, if the constitution really secures to a party in a chancery suit the right to have the witnesses examined in open court on the trial—as we are of the opinion it does—then the provision must have effect, whatever inconvenience may attend the practice. In this case, it seems, the circuit court commenced taking the testimony, but, supposing it would be voluminous, refused to proceed, and ordered it to be taken before a special commissioner. If the parties had consented to this method of taking the evidence, of course there could be no objection to it. But the appellant claimed the right to have the witnesses examined in open court, and this he was entitled to if he insisted upon it. We cannot give the above provision of the constitution any other rational construction. In *Noonan vs. Orton*, 5 Wis., 60, this court had occasion to examine this provision of the constitution, although it did not become necessary, in disposing of that case, to put an authoritative construction upon it. The court, however, says upon this point: "We have no doubt that each party to a suit in chancery is, under our

January Term, constitution, entitled to have his witnesses examined in open
1862.

court, subject of course to the occasional exceptions provided for in cases at law." And it is clearly intimated in the opinion, that a party may be entitled, if he demands it, to have the witnesses of the adverse party so examined, subject to the like occasional exceptions.

We fully concur in the correctness of this view of the constitutional provision, and think it settles the question of practice in this case conclusively in favor of the appellant. We must therefore reverse the judgment of the circuit court, and send the case back for a new trial.